OPINION OF THE COURT
Martin B. Stecher, J.
The plaintiff moves for summary judgment in this condemnation proceeding. One of the defendants cross-moves for summary judgment. Also considered here are various applications for disclosure and other motions disposed of herein. By separate order these matters have been ordered to be tried in a joint trial.
Prior to the commencement of this action the plaintiff, a "corporate governmental agency of the state, constituting a political subdivision and public benefit corporation” (L 1968, ch 174, § 4, subd [1]), acquired title to the Commodore Hotel in New York City.* Wembley Realty, Inc., purchased the hotel from a subsidiary of the insolvent Penn Central Transportation Company and sold it to the plaintiff New York State Urban Development Corporation (UDC) for one dollar. UDC thereupon leased it back to Wembley which is reconstructing the hotel. UDC continues to retain title; presumably for the substantial tax benefits which accrue by virtue of UDC’s ownership (Wein v Beame, 43 NY2d 326) and, among other reasons, to clear the property of various interests such as holders of easements and long-term tenancies.
Several of the parties have attacked the petition as having been brought under the wrong statute. This action was initiated under the Condemnation Law. The Condemnation Law was terminated by statute effective July 1, 1978 and in its place was enacted the Eminent Domain Procedure Law which demands that numerous procedures more onerous to a condemning authority be followed than previously were required under the Condemnation Law. Were the Eminent Domain Procedure Law applicable there is doubt that the court would assert jurisdiction under this petition.
I have heretofore held a hearing on the issue and in *269 accordance with the findings I made on the record of that hearing I find that this proceeding was begun prior to July 1, 1978 (Iroquois Gas Corp. v Jurek, 30 AD2d 83, app dsmd 22 NY2d 908), and accordingly was properly commenced under the Condemnation Law. The second affirmative defense raised by the defendant Commodore Photo Dealer, Inc. (Commodore), the seventh affirmative defense raised by defendant Comstraw, Inc. (Comstraw), and the fifth affirmative defense raised by defendant Henry Modell & Co., Inc. (Modell), are all dismissed, as is the defense inferentially raised in point four of the memorandum of law of Vanderlex Merchandise Co., Inc.
Modell’s separate motion to dismiss the complaint on these same grounds is denied.
A defense is raised that the statute under which the UDC has acted does not grant it the authority to condemn realty for the purpose of either owning or operating a hotel. The UDC has initiated the plan of rehabilitation as an "industrial project” (L 1968, ch 174, § 1 et seq., as amd by L 1973, ch 446, §1; L 1968, ch 174, §3, subd [6], par [b]). The latter statute includes in its definition of industrial project, "A project * * * designed and intended for the purpose of providing facilities for * * * business or other * * * commercial purposes”. Webster’s New World Dictionary (2d ed) includes in its definition of "business” "the buying or selling of commodities and services;” and in its definition of "commerce” suggests that it is a synonym of "business”. A hotel such as the one planned for this project is clearly intended to sell services and as such is a business project. Given the statutory mandate that the courts liberally construe the powers given to UDC in order to accomplish UDC’s statutory purpose (L 1968, ch 174, § 34) of halting the progress of blight in "nonresidential areas” (L 1968, ch 174, § 2), I conclude that this project is an industrial project within the meaning of the statute.
The plaintiff places great reliance on the case of Wein v Beame (supra) and would have the court treat all the issues raised here as matters already adjudicated. Neither res judicata nor collateral estoppel is available here as none of these defendants was a party to the Wein action. Moreover, Wein v Beame (supra) simply held that on the mere acquisition of title to real property by UDC, the property acquired. a tax-exempt status. Nonetheless, this court cannot ignore the fact that in reviewing the real property tax arrangements and other financial arrangements made by UDC with the City of *270 New York, the Court of Appeals necessarily considered the scope of UDC’s powers. Clearly, that court concluded, as I conclude, that this hotel project is within the UDC powers of condemnation.
Accordingly, Vanderlex’s fourth defense and Modell’s ninth defense are stricken.
Modell’s first affirmative defense challenges the sufficiency of the complaint by asserting that the petition fails to set forth the names and places of residence of its directors, allegedly in violation of subdivision 1 of section 4 of the Condemnation Law.
The plaintiff, however, is a "political division of the state” (see L 1968, ch 174, § 4), and, therefore, the petitioner was only obligated by the Condemnation Law to set forth the names and addresses of its principal officers in the petition. This requirement has been met and the defendant Modell’s first affirmative defense is stricken.
Vanderlex’ seventh defense that the pleading fails to state the basis for the findings of necessity made by UDC’s board does not state a defense as the statute (L 1968, ch 174, § 10, subd [f]) does not require such findings to be pleaded. It is clear from the exhibits (e.g., the minutes of the UDC directors’ meeting of March 23, 1976, the resolutions of that date and the data presented and filed on that and subsequent dates) that such basis was fully stated.
One of the defendants asserts that the resolution of the board of directors of UDC authorizing the exercise of eminent domain powers was adopted by fewer than "a disinterested majority of the nine person Board of Directors”, that is, that the resolutions "were approved by fewer than five disinterested members of the plaintiff’s nine member board.”
Generally, when a board or similar body charged with any public duty seeks to act, "a majority of the whole number of such persons * * * shall constitute a quorum and not less than a majority of the whole number may perform and exercise [the board’s] power, authority or duty” (General Construction Law, § 41; Matter of Squicciarini v Planning Bd. of Town of Chester, 38 NY2d 958). The law is different for the UDC. Actions by the UDC may be undertaken at a meeting where a quorum shall consist of "[a] majority of the directors of the corporation then in office” (L 1968, ch 174, § 4, subd [10]; emphasis supplied). It is clear from the plaintiff’s uncontradicted affidavits that at all material times, the UDC, al *271 though authorized to have a board of nine directors, in fact had but six directors and by law a quorum could consist of as few as four directors. All six directors attended the meeting in person or by proxy. (The Superintendent of Banks and the Superintendent of Insurance are, by statute, UDC board members [L 1968, ch 174, § 4, subd (1)]; but by the same statute these directors are permitted to designate deputies to serve in their places [L 1975, ch 449, § 5]. These deputies were present at the meetings at which this project was approved.)
It is apparent that at the meeting of March 23, 1976, four affirmative votes were cast which approved the general project plan and authorized condemnation; and that on September 8, 1976 the resolution which reaffirmed the general project plan was supported by the votes of four of the directors, including the vote of one deputy. Where a quorum by law consists of four members it is obvious that four affirmative votes are sufficient to adopt the necessary resolution.
The evidence submitted on behalf of UDC is clear and convincing as to the number of directors then in office, the number who attended the meetings and the number who cast affirmative votes. No evidence whatever is offered to show that a different number was required to constitute a quorum or a different number of affirmative votes was required to take action or a lesser number of affirmative votes was actually cast. Under such circumstances, the court will not permit further delay for the purpose of taking depositions and this issue is determined favorably to the plaintiff (CPLR 3212, subd [g]; Yonkers Community Dev. Agency v Morris, 37 NY2d 478, 486, app dsmd 423 US 1010).
In its effort to sustain its challenge to the sufficiency of the directors’ vote, Comstraw emphasizes that the affirmative votes required must be those of "disinterested members” of the board. It asserts in the affidavit of Daniel P. Levitt, Esq., sworn to October 26, 1978, that circumstances exist which require an inquiry by way of deposition into the "disinterestedness” of the chairman of the UDC at the time the project was approved. In his affidavit, Mr. Levitt informs me that by means of the "informal” discovery of plaintiff’s documents provided by stipulation on the record, the then chairman of the UDC "cast the decisive vote in connection with each resolution.” The affidavit further alleges that the then chairman of UDC was simultaneously a principal in HRH Construction Corporation; and that "within days of [his] resigna *272 tion from the Board and the sale of HRH to Starrett Corporation, representatives from HRH began attending Commodore Hotel Industrial Project Construction meetings.” Eventually, asserts Mr. Levitt, Starrett’s newly acquired subsidiary, HRH, was awarded the construction contract for the hotel. Corn-straw wishes to inquire by deposition into the time when Trump and Starrett first began their negotiations, the consideration the UDC chairman received from Starrett for his HRH stock and what interest, direct or indirect, he retained in Starrett after the acquisition.
Directors of UDC are "subject to the provisions of sections seventy-three and seventy-four of the public officers law” (L 1968, ch 174, § 4, subd [3], as amd by L 1975, ch 61, § 4).
Section 74 of the Public Officers Law is the State code of ethics. It prohibits any officer of a State agency from having "any interest, financial or otherwise, direct or indirect, [from engaging] in any business or transaction * * * which is in substantial conflict with the proper discharge of his duties in the public interest.” (Public Officers Law, § 74, subd 2.) Subdivision 4 of section 74 provides that in the event of a violation, "[i]n addition to any penalty contained in any other provision of the law”, the offending officer "may be fined, suspended or removed from office”.
Subdivision 1 of section 73 of the Public Officers Law defines the word "compensation” broadly to include any "thing of value or financial benefit”. Subdivision 7 provides, in part that "[n]o person who has served as an officer or employee of a state agency shall within a period of two years after the termination of such service or employment * * * receive compensation for any services rendered on behalf of any person, firm, corporation or association in relation to any case, proceeding or application with respect to which such person was directly concerned and in which he personally participated during the period of his service or employment”. A violation of section 73 may be punished as a misdemeanor. (Public Officers Law, § 73, subd 10.)
I have examined carefully into the law concerning alleged violations of sections 73 and 74 of the Public Officers Law. I assume that the attorneys for the defendant Comstraw have also done so. They have cited no case and I have discovered no case which suggests that even if their suspicions were well founded, the vote cast by a member of a board or commission could be nullified. Numerous cases are reported concerning *273 the effect of corrupt practices on contracts (see Sturm v Truby, 245 App Div 357, 360-361) which are thereby rendered void or voidable, but none which voids the legislative act of any agency.
An action by a board such as the UDC in adopting a project is a legislative act as distinguished from an adjudicative act (Matter of Kew Gardens Sanitarium v Whalen, 55 AD2d 226, 228, affd 43 NY2d 675; cf. Alaska Airlines v Civil Aeronautics Bd., 545 F2d 194; Matter of Lakeland Water Dist. v Onondaga County Water Auth., 24 NY2d 400, 407).
It is difficult to see how the "legislation” of a public corporation pursuant to which public agencies have acted, millions of dollars have been spent and the character of an area, neighborhood or even a whole city has been altered can be halted or reversed because of a violation of section 73 or 74 of the Public Officers Law.
Here there is no evidence whatever of any corrupt act on the part of any UDC board member. If such there were, the statute provides for punishment and the law might void the allegedly corrupt agreement; but the legislative act itself must remain intact unless and until reversed by other legislative action. There being no demonstration of corruption and no demonstration that corruption discovered could undo the adopted resolutions of the UDC, the defendant Comstraw’s sixth defense must be stricken and the Modell application for disclosure on this relationship be denied.
The defendant Vanderlex in its third defense asserts that by reason of the lease made by UDC to Wembley Realty, Inc., that UDC is no longer interested in the property and, therefore, has no standing to initiate this condemnation proceeding. The defense is without merit. The underlying purpose of the statute and the participation by UDC in this particular project is to halt the area from sliding into a slum. The fact that the property has been leased to another pursuant to a long-term lease (see L 1968, ch 174, §§ 6, 7, 8) does not terminate UDC’s interest as fee owner or its interest in preventing further blight to one of the most important commercial areas in the State (Yonkers Community Dev. Agency v Morris, 37 NY2d 478, supra).
The motion to strike Vanderlex’ third affirmative defense is granted.
A parallel defense raised is that the taking is for a private and not a public purpose. That the private profit of Wembley *274 and its principals seems to be at least as significant in the over-all scheme as the public purpose of halting blight cannot be doubted. However, as observed by Judge Fuchsberg in Yonkers Community Dev. Agency v Morris (supra, p 482): "Nor does it undercut the public purpose of the condemnation of the substandard land that Otis’ motives are to serve its own interests. There is nothing malevolent about that. Most sponsors, where urban renewal involves industrial revival, are, as may be expected in our private enterprise economy, nonpublic and, at least in large part, profit-motivated. Indeed, that may even be desirable, since, unless there is such a reliable projection of profitability, the soundness and stability of the sponsor’s project may come into question.”
The defense of lack of public purpose is without merit. (Cf. Wein v Beame, 43 NY2d 326, supra; Cannata v City of New York, 11 NY2d 210; Amsterdam Urban Renewal Agency v Bohlke, 40 AD2d 736; Matter of Port of N Y. Auth. [62 Cortlandt St. Realty Co.], 18 NY2d 250.) Commodore’s eleventh defense, Modell’s tenth defense, Comstraw’s ninth defense and Vanderlex’ fifth and sixth defenses are stricken.
Several of the defendants raise a defense of failure of the plaintiff to bargain in good faith for the acquisition of these leaseholds prior to the commencement of this action (Condemnation Law, § 4, subd 5), in that in each of the proceedings UDC made an initial and allegedly inadequate offer for the fixtures only, and made no offer for the value of the respective leaseholds.
While failure to make an offer for the leasehold might, prima facie, indicate a failure to bargain in good faith (cf. New York State Elec. & Gas Corp. v Schiener, 60 AD2d 981), under the peculiar circumstances existing in these cases, the failure to make such an offer is not a failure to bargain in good faith.
Each of the leases entered into between these parties or their predecessors as tenants, and a corporation subsidiary to Penn Central Railroad Company as landlord, contains a provision terminating the lease upon the taking of the property in condemnation.
With ample reason, the defendants argue that the intent of the parties who agreed to such a clause was to recognize as a force majeur a taking by a nonparty agency of government; not the hostile act of their own landlord. At this stage of the proceeding, however, I do not intend to be involved in the *275 interpretation of this clause. Whether the parties intended that this clause apply only to the taking by an outside agency will be reserved, if necessary, to the trial of damages.
I only hold for the purposes of this motion, that the plaintiffs reliance on the express language of the lease is not so unreasonable as to constitute failure to deal in good faith. The plaintiff in its negotiating posture was not acting in bad faith in asserting that it was the beneficiary of a clearly articulated clause of the lease.
It is also submitted that the amount of each offer was far less than the value of the fixtures. Such a fact, if true, does not necessarily require me to conclude that there was a failure to bargain in good faith; it is a usual mode of bargaining. There is no indication here of any refusal on the part of the plaintiff to bargain further than the initial offer.
Nonetheless, a disparity is alleged between the value of the fixtures and the offers which is so great, that a trial of the issue of good faith will be had. On the other hand, the assertion that the force majeur clause "is inapplicable” is not a defense to condemnation and Commodore Photo’s thirteenth defense is stricken.
Commodore Photo in its first, fifth and sixth defenses, the defendant Modell in its third and fourth defenses, and the defendant Vanderlex in its seventh defense variously allege that the petitioner failed to state a cause of action in that the contents of the resolution authorizing the acquisition of the leaseholds are insufficient; that the petition fails to allege adequately the need to condemn the leaseholds themselves; and there is an insufficient showing of a need to actually acquire the entire leasehold rather than either an easement or some other form of less than total divestiture. Similar failures to allege a cause of action are asserted in that the petition fails to show that the property condemned, particularly the leaseholds, are substandard or unsanitary.
Resolution No. 2180 of the board of directors of UDC, adopted March 23, 1976, expressly authorizes the plaintiff to acquire "all or part of the real property.” There is no need to designate specifically each leasehold, or to designate the metes and bounds of each leasehold. The description of the Commodore Hotel by metes and bounds is an adequate description within the meaning of the statute (Comdemnation Law, § 4, subd 2). The intent of the Condemnation Law, as is the intent of pleading generally, is that the parties and the court be *276 made aware of the property and interests being acquired. There is no question that the resolutions authorizing the acquisition of "all or part” is a resolution broad enough to acquire leasehold interests in the described realty and to inform the court and the parties of the estates to be acquired.
Those defenses which attack the sufficiency of the petition on the ground that there is a failure to allege a need to terminate each leasehold raise mixed questions. In and of itself the pleading adequately alleges the need to acquire the leasehold property. What is unclear to me from all of the conferences had and the variety of documents submitted since this matter first came to my attention is the fact that it has never been made clear the extent to which the present building is to be razed and the extent of the interest in the leaseholds which must necessarily be acquired in order to accomplish the purpose of the project. It has been variously alleged that razing would take place to, but not including, the street level, that is the level which encompasses all of these stores, and that the proposed plan intends the continuation of stores — although not necessarily the stores of these defendants —in the project. Other allegations have been made that the building is to be razed to street level and that some other building usages are intended.
"The general principle that there is no right to condemn land in excess of the need for public purposes, and that no more may be taken than is required for the particular public purpose, applies not only to the volume of land to be taken, but as well to the nature or extent of the estate in the property taken. In general there may not be the acquisition of a fee where only an easement is required.” (Hallock v State of New York, 32 NY2d 599, 605; see, also, Long Is. Light. Co. v Lambert, 77 Misc 2d 511.)
Just as it is a proper area of inquiry for the court to determine whether a fee or only an easement is necessary, it is equally proper to inquire whether the entire leasehold must be terminated or whether it is sufficient for petitioner’s purposes that an easement of passage or temporary occupancy only be granted during the course of construction. This issue will be tried.
Of a similar nature is the contention that the plaintiff has failed to file a map of each leasehold to be condemned in violation of section 6263 of the Unconsolidated Laws. (L 1968, ch 174, § 13, as amd by L 1977, ch 840, § 122.) A sufficient map *277 has been filed of the Commodore Hotel area. It is not necessary under this statute to separately file a map delineating each leasehold or, for that matter, to delineate accurately on the over-all map of the Commodore Hotel each leasehold acquired. Fee title to the underlying property has been acquired and a sufficient metes and bounds description is obviously set forth in the title deeds duly recorded. Interests such as leaseholds contained in the property previously acquired need not under the statute be a subject of separate mapping.
Modell’s eighth affirmative defense is similarly inadequate. The statute (L 1968, ch 174, § 16, subd [2]) requires only the filing of a "general project plan”. There is no allegation that it has failed to file such a plan. The contentions that the filed plan is not precise or that amended plans were not filed fail to state a defense. The purpose of statutory provision is to give notice to the public, the parties and the court of the nature of the acquisition and the nature of the project. Petitioner has done so sufficiently.
Finally, the contention of the Modell answer that the leasehold area is not alleged in the complaint to be substandard or unsanitary, fails to state a defense. It is a sufficient allegation in the pleading that the "area” that is the neighborhood in which the property is situated is in such a condition (see Wein v Beame, 43 NY2d 326, supra). There is no need to allege that each store is in danger of becoming substandard or unsanitary. It is necessary for the parties to keep in mind the statutory mandate that the UDC act be liberally construed to effect its purposes (L 1968, ch 174, § 34).
The Commodore’s first, fifth and sixth defenses, Modell’s second, third, fourth, sixth, eighth, eleventh and fifteenth defenses and Vanderlex’ seventh defense are all stricken.
Comstraw in its first defense asserts a pending injunction proceeding. Such a proceeding may not be interposed as a defense and it is stricken.
In its second defense Comstraw alleges a written agreement with Wembley Realty, Inc., the entity which purchased the hotel from the Penn Central interests, conveyed it to UDC for one dollar, took back a long-term lease and is the principal immediate beneficiary of all of this activity and all of these proceedings relative to the Commodore Hotel. By the terms of that agreement not only was Comstraw to have most of its present space and perhaps some additional space for an enlarged rental and an extended term commencing on comple *278 tion of the renovated or rebuilt hotel but the agreement also provided for access to the premises by Wembley during the course of construction in the following language:
"During the terms of construction, Wembley will use its best efforts to keep present Comstraw shop in operation and Comstraw will allow Contractors to do any and all work necessary to create the new hotel building above, including but not limited to the erection of staircases, altering of demising walls, etc. Comstraw agrees that within sixty (60) days from the notification by Wembley to Comstraw that their store space is necessary for construction of the hotel, Com-straw will then immediately vacate the premises. Time is of the essence.
"During the construction of the new hotel building and while Comstraw remains open, Comstraw will continue to pay rent at current level and supply its own utilities and services.”
This defendant alleges "compliance” with the agreement and there is no adequate allegation to the contrary (CPLR 3015, subd [a]).
In short, what we have here is a challenge to necessity; for it has been held that where the proposed condemnor and landowner have already agreed to the terms of a conveyance, and the landowner is willing and able to perform his side of the bargain, the would-be condemnor may not maintain a condemnation proceeding (New York Auburn & Lansing R. R. Co. v Dunning, 138 App Div 377). I recognize, of course, that Wembley is not a party to this proceeding and that the petitioner and condemning authority is UDC and not Wembley. Nonetheless, the issue before the court is one of the necessity for taking and if the allegations of this defense are adequately supported, there will be no need to condemn this leasehold. Any question concerning the joinder of parties will be disposed of at the conference to be had or in a companion proceeding which may be joined with this proceeding.
In any event, this question of necessity must be tried.
Comstraw has also asserted in substance that the City of New York was defrauded into giving its assent to an encroachment on the city’s air rights and to the commencement of these condemnation proceedings. The short answer is that the city did consent on May 19, 1978, and only the city may withdraw that consent. This defendant may not substitute *279 itself for the Board of Estimate, Council and Corporation Counsel in raising this issue (Kelly v Kosuga, 358 US 516; New York Stock Exch. v Goodbody & Co., 42 AD2d 556).
Comstraw’s fifth defense is stricken.
Commodore’s third and ninth "defenses”, a demand for a trial, do not constitute defenses and are stricken.
Commodore’s fourth "defense,” which merely seeks a deposition, does not state a defense and is stricken.
On the question of disclosure, I have carefully considered each application for disclosure made by the various parties. Most were made before the informal discovery of documents agreed to on the record. Other applications have been made thereafter and for depositions. I do not find that any issue left to be tried requires further disclosure after the far reaching and co-operative document, discovery provided by the plaintiff and all such applications are denied.
Modell’s seventh affirmative defense asserts that the petition fails to allege that the plans and specifications assure adequate light, air, etc. (L 1968, ch 174, § 10, subd [b], par [6]), a feasible method for the relocation of "individuals” (the statute reads "families and individuals” [L 1968, ch 174, § 10, subd (e)]) and the "basis for [the plaintiff’s] findings” (L 1968, ch 174, § 10, subd [f]). These allegations do not state a defense. The "relocation” language refers to persons making their residence in the area who are likely to be removed. No defendant here is in that category. As to the other cited provisions, nowhere does it appear that such statutory requirements must be pleaded; and there is no allegation that they have not been complied with. The defense is stricken.
Similarly, its thirteenth affirmative defense asserts that prior to entering into its lease with Wembley, it was required (L 1968, ch 174, § 8, subd [2]) to publish the terms of that lease. While the Wembley lease is unquestionably at the heart of this project and the reason for this condemnation, such publication is not jurisdictional. Accordingly, the thirteenth defense is stricken.
The defendant Comstraw, in its eighth defense, challenges the entire Commodore Hotel area industrial project because of its failure to comply with the New York Environmental Quality Review Law (EQRL). It also alleges certain failures to comply with regulations of the New York City Landmarks Preservation Commission (Administrative Code of *280 City of New York, § 207-1.0 et seq.) with respect to Grand Central Station, a New York landmark.
The EQRL adopted in 1975 is article 8 of the Environmental Conservation Law. Its intent is that every public agency within the State file with the Commission of Environmental Conservation of the State (and with other designated Federal, State and local agencies) a statement concerning the environmental impact of the project. It is conceded that no such statement was filed concerning the impact of the Hotel Commodore project although in terms of the nature of the project, it is clearly within the contemplation of the statute (ECL 8-0105, subd 4, par [i]; subd 5, par [iii]) consisting of "action” by an "agency” of government which is not mere maintenance but involves "substantial changes in [an] existing structure”.
The statute (ECL 8-0117, subds 1-4) provided staged implementation. Where the actor whose work may affect the environment is an agency of the State (e.g., the UDC), the effective date of the statute was September 1, 1976. When the action is to be taken by a local, as distinguished from a State, agency, with funding from a State agency, or where the Department of Environmental Conservation identifies the local agency action as likely to require preparation of an environmental impact statement, the effective date of the statute was June 1, 1977. Where the action involves funding assistance from a local agency and involves "the issuance to a person of a lease, permit, certificate or other entitlement for use or permission to act by one or more state or local agency,” the effective date of the statute was September 1, 1977. With respect to all other actions, the effective date was November 1, 1978.
It is clear that with respect to this "action,” that is the reconstruction of the Commodore Hotel, the effective date of the EQRL was September 1, 1977. The "action” involved funding assistance from the City of New York in the form of tax relief (see Wein v Beame, 43 NY2d 326, supra) and involved the issuance of a lease pursuant to whose terms the "action” of reconstruction was undertaken.
Where the action is "undertaken or approved prior to the effective date” of the EQRL no environmental impact statement need be filed (ECL 8-0111, subd 5). There can be no dispute that the plan of renewal was approved on September 8, 1976, nearly a full year prior to the effective date of the statute.
The defendant Comstraw, however, points to an exception to *281 this exclusion from the requirement of compliance. ECL 8-0111 (subd 5, par [a], cl [i]) provides that despite the adoption of the plan prior to the effective date of the EQRL, "where it is still practicable either to modify the action in such a way as to mitigate potentially adverse environmental effects or to choose a feasible and less environmentally damaging alternative * * * the commissioner [of Environmental Conservation] may, at the request of any person or on his own motion * * * require the preparation of an environmental impact statement”. Thus, where the exclusion applies, as it does here, the exception — requirement that an impact statement be filed nonetheless — can only come into being upon the initiative of the commissioner. There is no allegation that the commissioner has so acted.
The failure to file an environmental impact statement does not constitute a defense.
Chapter 8-A of the Administrative Code of the City of New York provides for the preservation of landmarks and historical districts within the City of New York. Pursuant to the terms of the local law Grand Central Station, abutting the Commodore Hotel has been declared a landmark and that designation has withstood attack (Penn Cent. Transp. Co. v New York City, 438 US 104). The provisions of the Administrative Code (§ 207-4.0) makes it "unlawful” "to alter, reconstruct or demolish any improvement constituting a part” of a landmark site unless the Landmarks Commission "has previously issued a certificate of no effect * * * a certificate of appropriations or a notice to proceed authorizing such work”. Certain exceptions not pertinent here are set forth in the local law.
As indicated above, Comstraw in its eighth defense, alleges that as part of the project, alterations are to be made by Wembley to Grand Central Station without Wembley or UDC having first procured the necessary certificate. If this is so, Comstraw or any other person may have standing to seek to have such violation of law enjoined (cf. Boryzewski v Brydges, 37 NY2d 361; Matter of Douglaston Civic Assn. v Galvin, 36 NY2d 1; contra Matter of Abrams v New York City Tr. Auth., 39 NY2d 990); but such issues are collateral to the plaintiff’s right to condemn the leasehold. That Wembley may violate the law by damaging a historical landmark adjacent to the hotel is no defense to this action.
Comstraw’s eighth defense is stricken.
*282 I am satisfied, on this motion for summary judgment, that the complaints set forth proper causes of action for condemnation, both within the Condemnation Law and the New York State Urban Development Corporation Act (L 1968, ch 174, § 1 et seq.); and that project is an industrial project (L 1968, ch 174, § 2, as amd by L 1973, ch 446; L 1968, ch 174, § 3, subd [6], par [b]) meeting the requirements of statute.
I further find that the separate defenses raised by the parties are without merit except for Commodore’s seventh, eighth, tenth and twelfth defenses; Modell’s twelfth and fourteenth defenses; and Comstraw’s second, third and fourth defenses; which to the limited extent provided above need to be tried. In all other respects the plaintiff has established that it is entitled to judgment. These issues will be tried before me promptly and counsel shall meet with me on February 8, 1979 at 3:30 p.m. in chambers to arrange for that trial. The entry of any further order shall await the trial.
The cross motions for summary judgment are denied.

 Hotel residents vacated voluntarily, as have most retail store tenants following the commencement of this action. Pour remain who have not and it is these leasehold interests which UDC desires to acquire [terminate] by virtue of its powers of condemnation.